**In the Matter of MUTUAL SECURITY SAVINGS & LOAN ASSOCIATION, INC.**

**No. 11463.**

United States District Court
D. Maryland.

March 13, 1963.

---

Samuel M. Greenbaum, Washington, D. C., for Charles A. Docter, Trustee in Bankruptcy.

Jacob A. Stein, Washington, D. C., for Robert H. Symonds.

Rourke J. Sheehan, David Berger, Washington, D. C., for Morton Lifshutz.

WINTER, District Judge.

The Referee certified to the Court that Robert H. Symonds and Morton Lifshutz should be required to appear before the Court and show cause why they should

not be adjudged in contempt. An order was signed requiring them to show cause, and they have appeared by counsel and submitted written memoranda and argument in the matter.

The Referee's certificate arises out of the refusal of Mr. Symonds, as president of the bankrupt, in filing schedules of the property and a list of the creditors of the bankrupt to complete any portion of the same, for the reason stated, in response to each item of information sought, "I respectfully refuse to answer this question for the following reasons: (a) that the answer may tend to incriminate me or may lead to evidence which may tend to incriminate me; (b) I claim this privilege under the Fifth Amendment to the Constitution of the United States, the laws of the United States, and under the Constitution, Declaration of Rights and the laws of the State of Maryland," and the failure on the part of each of Mr. Symonds and Mr. Lifshutz, when examined at the first meeting of creditors, to answer any question concerning his connection with, or the affairs of, the bankrupt, on the ground that the answer might tend to incriminate him. Mr. Lifshutz is allegedly a director, or former director, of the bankrupt.

The schedules were required to be filed on or before February 17, 1962. On February 27, 1962, Mr. Symonds filed a motion that the order requiring the filing of schedules of the property and a list of the creditors of bankrupt be vacated. The motion was heard and denied on March 2, 1962. On March 19, 1962, Mr. Symonds moved to extend the time for filing schedules until April 8, 1962, but failed to file a list of the creditors of the bankrupt, as required by §§ 7, sub. a(8) and 7, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 25. This motion was not acted on and, on April 6, 1962, the schedules were filed, with the response to each item of information requested as set forth above.

The bankrupt—ostensibly a building and loan association—was adjudicated to be an ordinary business corporation and not a building and loan association within the meaning of 11 U.S.C.A. § 22, on February 12, 1962, upon the ground that the bankrupt did not conduct its operations within the framework of even the then limited regulations imposed on savings and loan associations by the State of Maryland, the place of incorporation of the bankrupt.

Since that time, of the estimated 8,000 creditors of the bankrupt, approximately 4,500 persons claiming to have been depositors in the bankrupt have filed claims estimated to aggregate $3,000,000.00. To date, assets of the bankrupt totaling only several hundred thousand dollars have been discovered by the Receiver and the Trustee, of which less than $200,000.00 has been cash.

There have been eight indictments returned against Messrs. Symonds and Lifshutz in the Circuit Court for Montgomery County, Maryland, charging, *inter alia*, embezzlement, fraudulent conversion after trust, theft of the funds of certain specific named depositors in the bankrupt, and conspiracy to defraud. Mr. Symonds also stands indicted, with others, in three indictments for larceny after trust of a Beechcraft aircraft, and conspiracy to have certain deeds of trust executed by a notary in blank, the substantive form and body of the deeds of trust not having been filled in or signed, and no person having appeared before the notary.

Even though Section 7 of the Bankruptcy Act, 11 U.S.C.A. § 25, after requiring an involuntary bankrupt to file schedules of assets and a list of creditors [§ 7, sub. a(8)] and to submit to oral examination at the first meeting of creditors [§ 7, sub. a(10)], provides that " * * * no testimony given by him shall be offered in evidence against him in any criminal proceeding [§ 7(a) (10)]," it has been held that this statutory protection is no substitute for the broader protection of the Fifth Amendment privilege against self-incrimination, Arndstein v. McCarthy, 254 U.S. 379, 41 S.Ct. 136, 65 L.Ed. 314. There the involuntary bankrupt had refused to answer questions at a

meeting of creditors and it was *held* that although the immunity provided by § 7, sub. a(10) would preclude use of the actual answers in a criminal proceeding, it would not preclude their use in obtaining other information useful in a criminal prosecution and, thus, the immunity was not broad enough to prevent the invocation of the privilege. For the subsequent history of the case, see McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023 (1923); 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924). See also, Czarlinsky v. United States, 54 F.2d 889 (10 Cir., 1931), cert. den. 285 U.S. 549, 52 S. Ct. 406, 76 L.Ed. 940, which indicated that the immunity provided by § 7, sub. a (10) does not apply to schedules required by § 7, sub. a(8) but only applies to questions asked at the meeting of creditors. Thus, even if we were to assume that the immunity applies to both *contra* Czarlinsky, it is clear the immunity so provided is not broad enough to prevent invocation of the Fifth Amendment privilege, Arndstein, supra.

Thus, it becomes pertinent to consider (1) the breadth of the privilege, and (2) the method by which it may be properly invoked under the circumstances of this case.

■ A long line of adjudications, beginning with an opinion by Chief Justice Marshall in one of his most celebrated cases, United States v. Burr (1807), 25 Fed.Cas. p. 38, No. 14,692e, and continuing to such recent authorities as Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950); Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L. Ed. 1118 (1951); Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955); Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997 (1955); United States v. Coffey, 198 F. 2d 438 (3 Cir., 1952); United States v. Goodman, 289 F.2d 256 (4 Cir., 1961) (dissenting opinion), judgment vacated and remanded for further proceedings, Goodman v. United States, 368 U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961), have stated the rule that the Fifth Amendment protects against actual incrimination and possible incrimination, including disclosure of any link in the chain of evidence needed to prosecute the claimant for a crime. See also, Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). It is a rule to protect the innocent, who otherwise might be ensnared by ambiguous circumstances, as well as the guilty, or potentially guilty.

■ Where the personal privilege is applicable and properly claimed, the question of how to determine whether an answer to a question or the furnishing of documentary information would constitute actual incrimination or possible incrimination, including disclosure of any link in the chain of evidence needed to prosecute the claimant for a crime, is a troublesome one. Determination of this question here brings into play grave considerations. The Court must not depart from the liberal respect of the privilege so well engrafted into American jurisprudence, but an improvident honoring of the privilege in derogation of the rights of the numerous creditors, including depositors of the bankrupt is to be avoided. Especially is this so because of the necessity of salvaging all that can be saved from the debacle that the bankruptcy of Mutual Security Savings & Loan Association, Inc. presents. On the part of Messrs. Symonds and Lifshutz the matter is also one of grave importance, not only because of the consequences of their being subjected to prosecution, irrespective of guilt or innocence, but also the summary power of the Court to punish for civil contempt and the wide range of penalties which might be imposed upon them for civil or criminal contempt, 18 U.S.C.A. §§ 401 and 402; Rule 42, F.R.Crim.P.

The problem of determination of proper invocation of the privilege was discussed in Hoffman v. United States, supra, a case in which the claimant refused to answer certain questions asked

him by a special federal grand jury making a comprehensive investigation of violations of numerous federal criminal statutes and conspiracies to violate them. The claimant had been publicly charged with being known as an underworld character and a racketeer, with a twenty-year police record, including a prison sentence on a narcotics charge. His refusal to answer questions pertaining to the nature of his present occupation and his contacts and connections with, and knowledge of the whereabouts of, a fugitive witness sought by the same grand jury, and for whom a bench warrant had been requested, was upheld. There it was said (341 U.S. pp. 486–487, 71 S.Ct. p. 818):

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patricia) Blau v. United States, 340 U.S. 159 [71 S.Ct. 223, 95 L.Ed. 170] (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. Mason v. United States, 244 U.S. 362, 365 [37 S.Ct. 621, 61 L.Ed. 1198] (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, Rogers v. United States, 340 U.S. 367 [71 S.Ct. 438, 95 L.Ed. 344] (1951) and to require him to answer if 'it clearly appears to the court that he is mistaken.' Temple v. Commonwealth, 75 Va. 892, 899 (1881). *However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to sur-*

*render the very protection which the privilege is designed to guarantee.* To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in Ex parte Irvine, 74 F. 954, 960 (C.C.S.D. Ohio, 1896)." (Emphasis supplied)

 Thus, the privilege may be claimed only where there is reasonable cause to apprehend danger. The burden of determining whether the claim is properly invoked rests upon the court and not upon the claimant, and is to be determined from the implications of the question and the setting in which it is asked. A claimant may not be required to prove his right to claim the privilege in the sense in which a claim is usually required to be established in court. At the close of the court's opinion, there is a further elaboration of these principles, where it is said (341 U.S. pp. 489–490, 71 S.Ct. p. 819):

"If this result adds to the burden of diligence and efficiency resting on enforcement authorities, any other conclusion would seriously compromise an important constitutional liberty. 'The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime.'"

 In the case at bar, the Montgomery County indictments have been made known to the Court, and the Court is also aware that in the last several years there have been numerous state receiverships of building and loan associations stemming from the lack of state regulation of their activities, as well as

prosecutions in this Court for violation of the mail fraud and other statutes arising out of the abuses which, again, stemmed from Maryland's lack, until recently, of any semblance of effective regulation of the activities of savings and loan associations. Yet, it is hard to believe that the bankrupt has assets of all of the types inquired about in the prescribed schedules of property and assets; and, if this be so, how a simple answer of "none" could tend to incriminate Mr. Symonds, or provide any link in the chain of evidence needed to prosecute him for any crime, or provide any reasonable basis on the part of Mr. Symonds for a belief that such might be so, is not apparent. The same may be said of the disclosure of certain types of assets if the bankrupt possesses them and the disclosure of certain liabilities of the bankrupt. Other than the setting in which the claim is asserted, Mr. Symonds, through his counsel, offers no understandable demonstration, in oral argument or brief, as to the basis on which he, as president of the bankrupt, uniformly, consistently and without exception has claimed the privilege in response to every inquiry on the prescribed schedule of property. Certainly, Mr. Symonds' activities in seeking extensions of time in which to file the schedules, and then ignoring the filing date and subsequently refusing to file, amply demonstrate his *mala fides* in other respects.

In the light of all of these considerations, the Court concludes that the claim of the privilege in regard to the schedules of the property and a list of the creditors of the bankrupt may well be contemptuous because not based upon a reasonable apprehension of danger, but the Court is unwilling to rule on which specific inquiries Mr. Symonds must answer, to impose sanction on Mr. Symonds to require his compliance with the Referee's order, or to initiate his prosecution for criminal contempt, on the present state of the record. Instead, the Court will direct that he file schedules of the property and a list of the creditors of the bankrupt within fifteen days from the date of filing of this opinion. This direction, however, will be without prejudice to his right to claim the privilege against incrimination in response to any disclosure which would constitute actual incrimination or possible incrimination, including disclosure of any link in the chain of evidence needed to prosecute him for any crime; but, to the extent that Mr. Symonds may make such claims, he is directed to provide to the Court, in a sealed envelope, a statement by his counsel of the basis upon which such claim is invoked. Such sealed envelope shall be for the use of the Court only, and, after the envelope has been opened, the claim considered, and such further proceedings, if any, as may be indicated, taken, the statement shall again be sealed and be subject to examination only by any reviewing court to which Mr. Symonds, being dissatisfied by the final disposition of this Court, may apply.

While the Court is unaware of any direct authority for the procedure to be followed as set forth above, the Court believes that there is an analogy between it and an earlier approved procedure to obtain books and records of an individual bankrupt where the bankrupt claimed the privilege. In the cases of In re Hess, 134 F. 109; 136 F. 988 (D.C.E.D.Pa. 1905), and In re Hark, 136 F. 986 (D.C. E.D.Pa.1905), orders were entered requiring the bankrupt to bring the books and papers which he claimed contained incriminating evidence before the court or referee in bankruptcy so that, if the plea was determined to be well-founded, the court could enter an order protecting the claimant from discovery of the evidence but, at the same time, enabling the trustee to obtain the desired information.

Since the decisions in Matter of Harris, 221 U.S. 274, 31 S.Ct. 557, 55 L.Ed. 732 (1911), and Ex parte Fuller, 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923), these cases are now of historical interest only, because both held that because title to books and records passes to the trustee, they are no longer the bankrupt's property, and he may be com-

pelled to produce them irrespective of the privilege. The former case indicated that a protective order was at most all that the bankrupt was entitled to, while the latter case required production without a protective order. Also, in the case of a corporate bankrupt, later decisions have held that the privilege may not be claimed by a person who possesses corporate books and records in a representative capacity, even though the effect of producing this information may be to incriminate him, Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); cf. Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). While the Hess and Hark cases required actual production of records, despite the possible existence of the privilege, this Court has concluded not to require answers to the inquiries in the statements in the case at bar at this time, because the latter may represent the work product or personal knowledge of the claimant, rather than simple production or transcription of records already in existence.

Much of what has been said is also applicable to the refusal, on the part of Messrs. Symonds and Lifshutz, to answer any questions on oral examination before the Referee concerning the affairs of the bankrupt. In the setting in which they were questioned and the nature of the questions, the Court cannot say that there may not have been a proper basis for them to claim the privilege, but it is unnecessary to decide this question now, because a reading of the transcript of that examination indicates that it was prematurely concluded by reason of the repeated claim of the privilege against self-incrimination on their part, and in these proceedings the Trustee, through his counsel, has indicated that there are additional questions that he desires to be put to one or both of these persons.

For these reasons, the oral examination of Messrs. Symonds and Lifshutz will be remanded to the Referee, with directions to reschedule their examination on a date to be fixed by him, not sooner than twenty days from the date of this opinion, and, to the extent that they may invoke the privilege in response to any question, to rule on the propriety of the claim in the light of the Montgomery County indictments, the general atmosphere of several years' duration surrounding Maryland savings and loan associations, and such statement, if any, in support of the claim as either witness, or his counsel, may desire to present. In the event that there is a refusal to answer because of the claimed privilege and the Referee is not satisfied that the claim is properly invoked, he shall, again, certify to this Court the question of why either witness, or both, should be required to appear and show cause why he should not be adjudged in contempt, with further proceedings to be taken by this Court as the facts may warrant.

It is so ordered.