## UNITED STATES v. DOTO.

No. 268, Docket 22688.

United States Court of Appeals
Second Circuit.

Argued May 7, 1953.

Decided June 24, 1953.

Edward J. Bennett, New York City (Corbin, Bennett & Delehanty and Harold H. Corbin, New York City, on the brief), for appellant.

Robert Martin, Asst. U. S. Atty., New York City (J. Edward Lumbard, U. S. Atty., New York City, on the brief), for appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The defendant, Joseph Doto, often referred to in the record as Joe Adonis, appeals from his conviction by a district judge, a jury trial having been waived, for contempt of a Committee of the United States Senate under 2 U.S.C. § 192 in refusing to answer a question. The Committee was the Special Committee to Investigate Organized Crime in Interstate Commerce, generally known as the Kefauver Committee, its Chairman being Senator Kefauver of Tennessee. The question was asked of appellant at a public hearing of the Committee in New York City on March 12, 1951; it was as follows: "Now, Mr. Adonis, did you ever make a political contribution to any campaign, state, local or national?" Appellant's response was: "I decline to answer that question on the ground that it might tend to incriminate me." Thereupon various other questions were propounded to him, to many of which he made the same response. He was indicted on sixteen counts, but was convicted only on the first count, that based upon the colloquy just quoted. The other fifteen questions as to which the trial judge sustained the privilege concerned various forms of business dealings with named individuals or concerns, the legitimate occupations in which appellant had engaged during the last five years, whether he had ever given anybody any money to help in a primary fight, and so on. The judge thought that appellant had no fear of a criminal prosecution from the first question, it not being a crime generally to make a political contribution, but that he might properly have such fear as to testimony of business connections in the light of the background, disclosed at earlier hearings, of implications that violations of federal income tax and other criminal statutes might well be charged against him.

Recent decisions of the Supreme Court have served to clarify the circumstances in which resort may be had to the privilege against incrimination of the Fifth Amendment to the United States Constitution. Thus, a complete statement is found in Hoffman v. United States, 341 U.S. 479, 486, 487, 71 S.Ct. 814, 818, 95 L. Ed. 1118, which involved business dealings of a person publicly charged with being known as an underworld character and a racketeer. Mr. Justice Clark said: "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patricia) Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. Mason v. United States, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344, and to require him to answer if 'it clearly appears to the court that he is mistaken.' Temple v. Commonwealth, 1881, 75 Va. 892, 899. However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from

the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." And the refusal below to sustain reliance on the privilege was reversed.

This view the Supreme Court has reiterated lately by rather emphatic and summary reversals of decisions below in United States v. Greenberg, 341 U.S. 944, 71 S.Ct. 1013, 95 L.Ed. 1369, and 343 U.S. 918, 72 S.Ct. 674, and United States v. Singleton, 343 U.S. 944, 72 S.Ct. 1041. We followed the Court's lead in United States v. Costello, 2 Cir., 198 F.2d 200, 202, certiorari denied Costello v. United States, 344 U.S. 874, 73 S.Ct. 166. See also United States v. Coffey, 3 Cir., 198 F.2d 438; Aiuppa v. United States, 6 Cir., 201 F.2d 287; Poretto v. United States, 5 Cir., 196 F.2d 392; Marcello v. United States, 5 Cir., 196 F.2d 437.

█ Applying these principles to the facts of this case we do not see how there can be much doubt that, in the descriptive words of L. Hand, J., United States v. Weisman, 2 Cir., 111 F.2d 260, 263, "the chase" had gotten "too hot," and "the scent, too fresh." From the beginning in the spring of 1950 the Kefauver Committee had committed itself to trying to discover whether there was a tie-up between organized crime and politics and government; and this appellant had been coupled with the defendant in United States v. Costello, supra, as ringleaders of such crime. The Committee's objective, together with its characterization of appellant, was reiterated in various public statements. Further, the First Interim Report of Committee, August 18, 1950, Sen.Rep. No. 2370, 81st Cong., 2d Sess., named appellant as one of the "known gangsters and racketeers from New York City" active in extensive gambling enterprises in Florida, that area being the particular subject of the Committee's report. In addition, he had been examined by the Committee at length in Washington, D. C., on December 12, 1950, and had there been cited for contempt for refusal to answer numerous questions. Many of these as to his business affairs were duplicated by questions later asked at the New York hearing; included in the earlier queries also was the question as to political contributions. In supporting his original citation for contempt, Senator Kefauver on the floor of the Senate, January 22, 1951, charged: "This man, Joe Adonis, is one of the big-time racketeers and criminals in this country." We are not informed why this proceeding for contempt was not brought to a conclusion before commencement of the later one now before us.

In the Second Interim Report of Committee, February 18, 1951, appellant was likewise given premier billing as an "underworld character" getting large receipts from gambling operations and as head, with Costello, of one of the "two major crime syndicates" of the country, infiltrating also into legitimate business. And general corruption and connivance was found at all levels of government—accomplished, *inter alia*, by contributions to the campaign funds of candidates for political office and, often, by contributions made to both major political parties. Appellant would have been indeed a fool not to have felt the hot breath of pursuit upon him. In fact he had no illusions, for at the start of the hearing on March 12, 1951, and before submitting to interrogation here, he read a lengthy statement, prepared with careful legal help, in which he referred specifically to these charges, stating his conviction that the Committee's sole purpose was to try to obtain evidence to be used against him in criminal prosecutions, some of which "have already been instigated."

Against this background it seems impossible to say that the question here asked was innocent of all criminal implications. As appellant's brief well puts it: "The fact of the contribution would be the first essential to be proven. And admission that the contribution had been made, leaving only the amount in issue or the purpose in issue, would be a most hazardous admission of half the crime." There seem literally innumerable statutes defining the other half of the crime: the Corrupt Practices Act, 2 U.S.C. §§ 241–252; the prohibition against campaign contributions exceeding

$5,000 a year and against bribery and the like generally, 18 U.S.C. §§ 608, 600, 597, 201, as well as the more general proscriptions of racketeering, conspiracy, and use of the mails to defraud, 18 U.S.C. §§ 1951, 371, 1302, 1342, 241. The scent seems much closer than in other cases upholding the privilege; for instance, the question as to ownership of the Hiss automobile of United States v. Rosen, 2 Cir., 174 F.2d 187, certiorari denied 338 U.S. 851, 70 S.Ct. 87, 94 L.Ed. 521. The conviction must be reversed and the appellant acquitted.

Reversed.