**UNITED STATES of America,**

v.

**Theodore TROCK, Defendant-Appellant.**

No. 293, Docket 24025.

United States Court of Appeals Second Circuit.

Argued March 6, 1956.

Decided April 9, 1956.

Judgment Reversed 76 S.Ct. 1048.

**840**

Leonard P. Moore, U. S. Atty. for Eastern District of New York, Brooklyn, N. Y. (Marie L. McCann, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Harry Krauss, New York City, for defendant-appellant.

Before CLARK, Chief Judge, MEDINA, Circuit Judge, and GALSTON, District Judge.

GALSTON, District Judge.

On February 21, 1956 Theodore Trock, the defendant, appeared as a witness before the grand jury for the Eastern District of New York, and was asked certain questions which he refused to answer on the ground that the answers might tend to incriminate and degrade him. He was brought before the court, and after failing to state any reason why the answers might expose him to criminal prosecution was directed to answer eleven questions which had been put to him.

On February 23, 1956 he again appeared before the grand jury but refused to answer the questions which he had been directed to answer. Then he was brought before the court and the questions were put to him by the court in the presence of the grand jury. He refused to answer; and failed, so it is charged by the Government, to show any reason why the answers might tend to expose him to criminal prosecution. Thereupon he was summarily committed to the custody of the United States Marshal to be held in close confinement for a period of four months. He was informed that he might purge himself of the contempt by complying with the court's order.

The court minutes disclose that Miss McCann, an assistant United States Attorney, explained to Judge Byers that there was an indictment outstanding against a man by the name of Thomas Tanner, then a fugitive, and that a codefendant, Isadore Hillman, had been convicted and was serving a sentence. The indictment had to do with the theft of certain goods in interstate commerce. Miss McCann explained that there were three other persons who had not yet been indicted, but against whom the Government might subsequently file indictments should investigation provide them with enough evidence. She added: "We have reason to believe that the witness, Mr. Trock, may have some knowledge of operations, or have some knowledge of the whereabouts of Thomas Tanner."

It appeared that Trock had been asked whether he knew one Harry Baus. At first he refused to answer. Subsequently he admitted, said Miss McCann, that he had seen Harry Baus in 1950. A third time, when asked whether he knew Baus, he refused to answer on the ground that it might tend to incriminate or degrade him.

The witness also refused to answer whether he knew Isadore Hillman. Likewise he refused to answer whether he knew a William Cooper. A succession

of questions followed: "Did you ever operate any business in New York?" "Did you ever register in any trade names in New York?" "Did you ever have any offices at 250 Broadway in New York?" "Did you ever have an office in 246 Fifth Avenue, New York City?" "Did you ever hear of the Gulf Trading Company?" "Did you ever hear of the Empire State Buying Company?" "Did you ever use the name of Thomas Tanner?" "Did you ever use the name of James Fausto?" "Can you type?" "Did you ever stay at the Hotel Victoria in New York City?"

The court requested the witness to stand before him, and the court asked him to explain why answering the questions whether he knew Baus, Hillman and Cooper would tend to incriminate him. Trock responded: "Well I honestly feel that making a statement there might incriminate me. That is just the way I feel." The following colloquy resulted:

"The Court: What is there incriminating about knowing a person by the name of Baus?

"Mr. Trock: Well evidently these people are wanted for something and I don't feel like being incriminated with them.

"The Court: What is there that would tend to expose you to a criminal prosecution if you answer the question 'Yes, I do know him' or 'No, I don't know him'?

"Mr. Trock: Well, I honestly feel that way.

"The Court: You have said twice that you feel that way. Now, is that feeling based on a reason?

"Mr. Trock: Well, the reason I feel I am just better off not answering that question."

The court then asked how answering the question whether he operated a business in New York City could incriminate him, and the court's interrogation of the witness in respect to all the other questions resulted in the failure of the defendant to explain why answers to those questions would tend to incriminate him. He was thereupon ordered to answer all of these questions. He was not ordered to answer questions about Thomas Tanner and James Fausto.

The defendant contends that the entire setting of the examination must be considered by the court, and that where it can be observed that the refusal to answer is not capricious, and where there is some basis for apprehension on the part of the witness, the court may not substitute its judgment for that of the witness. Defendant argues that the court in interpreting the refusal to answer need not base it upon a positive showing of incrimination.

Nevertheless, in appraisal of these eleven questions, when viewed independently each one is certainly free of any criminal suggestion. It does not require the opinion of a psychologist to establish that one laboring under a guilt complex when appearing before a grand jury might decline to answer any and all questions propounded to him; but such an attitude in and of itself would not protect such a witness from the necessity of complying with a court order to answer questions which were free from criminal implication, and not part of a link or setting connoting criminal implication.

We approach then a study of cases which bear on the legal principle involved.

Chief Justice Marshall in United States v. Burr (In re Willie), 25 Fed. Cas. No. 14,692(e), pp. 38, 39, said:

"The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule and of the exception to that rule, by observing that course which it is conceived courts have generally observed. It

is this: When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may incriminate himself, then he must be the sole judge what his answer would be."

The foregoing passage is quoted in Mason v. United States, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198. In that case Justice McReynolds added:

"The constitutional protection against self-incrimination 'is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law.' Heike v. United States, 227 U.S. 131, 144, 33 S.Ct. 226, 57 L.Ed. 450, 455; Brown v. Walker, 161 U.S. 591, 599, 16 S.Ct. 644, 40 L.Ed. 819, 822."

United States v. Doto, 2 Cir., 205 F.2d 416, led Judge Clark to review leading authorities bearing on the question involved, including Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L. Ed. 1118; Blau v. United States, 340 U. S. 159, 71 S.Ct. 223, 95 L.Ed. 170; Rogers v. United States, 340 U.S. 367, 71 S. Ct. 438, 95 L.Ed. 344; and Mason v. United States, supra. In Hoffman v. United States, the question presented involved business dealings of a person publicly charged with being known as an underworld character and a racketeer with a twenty year police record, including a prison sentence on a narcotics charge. The questions he refused to answer pertained to the nature of his present occupation and his contacts and connections with, and knowledge of the whereabouts of a fugitive witness sought by the same grand jury, and for whom a bench warrant had been requested.

Judge Clark, referring to the opinion of Mr. Justice Clark, quoted the following passage from the Hoffman case [341 U.S. 479, 71 S.Ct. 818]:

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patrica) Blau v. United States, 1950, 340 U. S. 159, 71 S.Ct. 223 [95 L.Ed. 170]. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. Mason v. United States, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself —his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438 [95 L.Ed. 344], and to require him to answer if 'it clearly appears to the court that he is mistaken.' Temple v. Commonwealth, 1881, 75 Va. 892, 899. However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

■ Applying then the test suggested in Hoffman v. United States, supra, to the facts of this case, it is not possible to find the presence of such a chain as is indicated in the Supreme Court opinion. There is no showing that the questions asked will "link" the witness with any criminal activity. See al-

so United States v. Costello, 2 Cir., 222 F.2d 656, 661, certiorari denied 350 U. S. 847, 76 S.Ct. 62.

It is for the court to determine whether silence is justified. In the instant case the appellant is not a notorious criminal or racketeer, nor apparently is anyone else whose name was mentioned in the hearings before the district court.

For other authorities see Elwell v. United States, 7 Cir., 275 F. 775. In that case the court followed the rule in Mason v. United States, supra, in affirming an order of the district court directing the witness to answer the question put to him before the grand jury whether he knew the name of a man who wrote an article which appeared in the Chicago Evening American on a given date.

United States v. Herron, D.C., 28 F.2d 122, held that a witness has no arbitrary right to decide the question of privilege.

O'Connell v. United States, 2 Cir., 40 F.2d 201, 204. In this case the witness refused to answer whether he was in business and whether he knew certain individuals. The grand jury was investigating a lottery which, as Judge Swan observed, almost always involved some use of the mails. He said:

> "The questions asked were apparently relevant, or at least were a proper introduction to further inquiries, which might elicit information that would lead to prosecution of crime. The appellant was not privileged to refuse to answer unless his answer would have a direct tendency to incriminate him; a remote or speculative possibility of danger is not enough." Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L. Ed. 1037.

As to some twenty-five questions, excluding some which related to bets through the Albany Pool, Judge Swan said:

> "* * * there are still plenty left of a type which he could not refuse to answer. * * *. His persistence in prematurely claiming the privilege and refusing to answer well justify a finding of contumacy." 40 F.2d at page 204.

In United States v. Flegenheimer, 2 Cir., 82 F.2d 751, the indictment alleged that the name Harmon was used as an alias by Flegenheimer, who was on trial. A witness, Di Larmi, when sworn at the trial, made a statement that he would decline to answer any question concerning a bank account in the names of " 'Joseph Harmon and Rocco De Larmi.' " No question concerning the bank account was propounded, but the witness was asked whether he knew Joseph Harmon. He declined to answer, claiming privilege of self-incrimination. The court held that whether the witness answered "Yes" or "No" could not possibly incriminate him, and that under the doctrine of Mason v. United States, supra; United States v. Weinberg, 2 Cir., 65 F. 2d 394, and Abrams v. United States, 2 Cir., 64 F.2d 22, it was established law that to justify silence under the claim of the Constitutional privilege, it must appear that the answer which might be given would have a direct tendency to incriminate.

It has not yet been said by the Supreme Court that questions innocuous in themselves in a "setting" or chain, such as is revealed in the record before us, would justify the witness in refusing to comply with the court order.

Should the witness decide to comply with the court order, in such event, if a second run of questions were propounded based on such answers as the witness might give to the foregoing innocuous questions, and were such second run questions to present a "hot pursuit," the time would then have arrived for a valid claim of immunity. But as the matter now stands, to quote Judge Swan, "his persistence in claiming privilege is premature."

The order of commitment is affirmed. This eliminates the appeal from the denial of the motion for bail.

CLARK, Chief Judge (concurring in affirmance).

The opinions of my brothers herein well set forth the present state of the authorities and the difficulties facing an inferior court in trying to apply the somewhat conflicting principles of the various applicable decisions. I am constrained to believe that, while Judge MEDINA may be stating the law of the future, Judge GALSTON is stating the law of the present, which is binding upon us. Let me say at once that I am in sympathy with what seems to be the developing law; I shall be relieved, rather than otherwise, if the Supreme Court goes to the logical conclusion toward which it appears to be headed, namely, that any honest claim of self-crimination, deliberately and positively made by a witness before a grand jury—a potential accused—must be respected. I heartily agree that the Fifth Amendment should be preserved, not diluted by doubtful interpretation—preserved more for the benefit of those of us who would demonstrate a true belief in democracy and the potent power of our democratic institutions than of the immediate beneficiaries of its claim. And unless we go as far as I have indicated, we do not have any satisfactory working principle to guide prosecutors and courts or to shield a potential accused.

But, trying to apply the law as it has been stated, I do think it clear that to grant the claim here would mark at least a step beyond any yet clearly taken. We may note the contrast with our previous most extensive holding, United States v. Doto, 2 Cir., 205 F.2d 416. There outside circumstances, notably the Senate crime investigation of the Kefauver committee, had definitely marked the accused as a well-known and important criminal along the very lines which the prosecutor's questions closely pursued. Here it is only upon a series of assumptions involving the existence of conspiracy and the close connection of the defendant therewith that we can make the forced deduction of self-crimination. Among these assumptions must be (a) that a single dubious question, even though excluded—here the use of the names Tanner or Fausto—makes a setting of danger which carries over to other questions themselves innocent; (b) that inquiries as to residing or carrying on of business in New York City or in particular places therein are taboo; (c) that also taboo are questions as to the witness's capabilities, such as the ability to use a typewriter; and (d) that inquiry cannot be made as to persons named, but otherwise unidentified. Of course on the primary assumptions stated, answers to questions such as these may easily be part of a web leading to conviction. But under the heretofore rule, it was just such assumptions which could not be made without something definite in the case to show the innocent appearing questions actually to be deadly. To turn the statement around, I suggest that if these questions without more are incriminating, then there is literally no question as to the witness's activities, capabilities, or acquaintances which he need answer. If the law is going that far, I think for many reasons, including proper respect for it, that the step should be done directly in the manner suggested above. It should not be accomplished by a form of indirection which can only puzzle prosecutors and courts and lead them to waste their time and energy in refinements of distinction without substance, while some witnesses are jailed and others are freed under quite similar circumstances. So I think we must await the Supreme Court's pilotage to go beyond the law as construed below.

MEDINA, Circuit Judge (dissenting).

I dissent and would reverse the conviction adjudging appellant guilty of contempt for asserting his constitutional privilege and refusing to answer the questions put to him before the Grand Jury.

The basic error, as I see it, is disclosed by the attempt on the part of the District Court to induce appellant to explain in a satisfactory manner how answering the questions would incriminate him.

When appellant said "I honestly feel that making a statement there might incriminate me," the Court replied, "That won't do."

But the giving of a satisfactory explanation might well have been more incriminating than answers to the questions; and we have held that to require the witness "to prove the hazard in the sense in which a claim is usually required to be established in court," would compel the surrender of "the very protection which the privilege is designed to guarantee." United States v. Doto, 2 Cir., 205 F.2d 416, 417; see also United States v. Coffey, 3 Cir., 198 F.2d 438. The protection of the Fifth Amendment would be a mere mockery if the witness could avail himself of the privilege only by demonstrating his guilt.

Thus it is to the surrounding circumstances and not to explanations by the witness that the Court must look to see whether the refusal to answer has some reasonable and credible basis. If such a scrutiny makes it highly probable that the refusal is due to mere whimsy, or scrupulosity, or reluctance to participate in the disclosure of criminality on the part of others, then the witness must answer the questions or take the consequences, even if his friends or relatives are the ones against whom prosecution seems imminent or possible.

What is the background here? Two indictments had already been handed down in the United States District Court for the Eastern District of New York charging Isadore Hillman and Thomas Tanner with theft of goods in interstate commerce. The indictments are not before us, but it does appear that Hillman pleaded guilty and is now serving the term of imprisonment imposed upon him by the judgment of conviction. We also know that the Gulf Trading Corp., at 220 Broadway in New York City, is involved and that there are "three other persons," whose names have not been disclosed, against whom indictments may subsequently be found. The full record of the questions put to appellant has not

been furnished but some of his answers to a few of the questions appear in the record and will be referred to shortly. The claim of the prosecution is that appellant "may have some knowledge of operations or have some knowledge of the whereabouts of Mr. Thomas Tanner." All we know about appellant is that he comes from somewhere in Massachusetts and that he vigorously insists that answers to the questions may involve him in some charge of conspiring with Hillman, Tanner and others in connection with the alleged theft of goods in interstate commerce or other federal crimes.

What should give us pause at the outset and is perhaps sufficient to dispose of the entire matter before us is that two of the questions put to appellant were, whether he ever used the name of Thomas Tanner, the missing fugitive from justice, and whether he ever used the name of James Fausto, a man connected with the purchasing department of Gulf Trading Corp. When appellant was brought before the judge for rulings on the questions these two were excluded, but they had been asked and the prosecutor thought them of sufficient importance to request the judge to direct the witness to answer them. This could scarcely have failed to impress appellant with the fact that he was at least suspected of using as aliases the very names of the fugitive and a person who might well prove to be the leader of the whole group. Moreover, in accord with what we considered in United States v. Scully, 2 Cir., 225 F.2d 113, 116, to be the practice in this circuit, appellant was "advised that he had the right to refuse to answer questions on the ground of incrimination." Furthermore, he had been asked these same questions by an FBI agent in Boston.

Other circumstances, viewed in their relation to one another, constituted such a pattern of suspicion, as to more than amply justify appellant's expressed belief that answers to any of the questions might provide leads to further disclosures, the inevitable or at least the probable effect of which would have been ap-

pellant's indictment for conspiracy or as a principal in the alleged scheme of stealing goods in the course of interstate shipment.

Thus, immediately after the question about using the name of Fausto, came another question, "Can you type?" The District Court saw no deprivation of constitutional rights in compelling appellant to answer this question. But the following letter, the authenticity of which is not disputed, makes it reasonably clear that someone whose real or assumed name was Fausto was participating in alleged illegal transactions through the instrumentality of Gulf Trading Corp. at 220 Broadway in New York City, and doing so by the use of typewritten documents. The letter follows:

"Gulf Trading Corp.,
"220 Broadway,
"New York 38, N. Y.
                "December 12, 1952
"Gentlemen:
"We are in the process of planning our future requirements. Possibly, your line may fit into our general picture.

"Do you have a local representative or sales office in this area, whom we may contact for samples and further information?

"Kindly send us descriptive literature, illustrations; quantity and trade discounts; delivery time and F. O. B. point; plus any other material your (sic) may deem helpful.

"Your prompt reply would be appreciated.

             "Very truly yours,
             "J. D. Fausto
             "Purchasing Dept.
"JDF/AM"

Perhaps the government may some day claim that appellant is none other than the Fausto who signed the letter, that he typed it himself in order that no subordinate could be in a position to testify against him, and that he is in fact one of the "three other persons" the prosecutor is looking for.

But this is not all. The first question he refused to answer was whether he knew one Harry Baus. Appellant admitted that he had seen Harry Baus in 1950, but refused to go further. His objection to answering the question whether he knew Hillman who had pleaded guilty and was in jail, was also overruled. A similar question about William Cooper was held to be proper. Immediately after the questions about Baus, Hillman and Cooper, came another question "Did you ever operate any business in New York"; and other questions related to his having registered in any trade names in New York, whether he ever had any offices at 220 Broadway, New York City, the address of Gulf Trading Corp., or at 246 Fifth Avenue, New York City, whether he ever heard of the Empire State Buying Company, which also appears to have been involved in the illegal operations, and whether he ever stayed at the Hotel Victoria in New York City.

The inference from all this is inescapable, it seems to me, that appellant may turn out to be one of the unnamed and unidentified missing men, or to have participated in some direct or remote way in the illegal scheme, and that any information provided by answers to any of the questions may complete or lead to the completion of the chain of proof against him. In that event it would of course be of no avail to appellant that the prosecutor now tells us that the investigation is not consciously aimed at appellant. Perhaps each question, standing alone and by itself, may seem innocuous. But, taken together, they fully support appellant's claim that to answer them may incriminate him.

Despite all the hue and cry against the Fifth Amendment it still stands as one of our fundamental constitutional rights and we must be zealous to preserve it, rather than to weaken and dilute it by interpretations of doubtful validity.