**Matter of Domenico BANDO, a witness before the August, 1956 Grand Jury.**

United States District Court
S. D. New York.
May 24, 1957.

Paul W. Williams, U. S. Atty., New York City, Arthur H. Christy, Silvio J. Mollo, Robert Kirtland, John A. Keeffe, Charles A. Miller, Herbert M. Wachtell, New York City, of counsel, for the Government.

Charles Schinitsky, New York City, for Domenico Bando.

HERLANDS, District Judge.

This is a proceeding under Title 18 United States Code, Section 401, subdivision (3), and Federal Rules of Criminal Procedure, Rule 42(a), 18 U.S.C.

The issue is whether the respondent Domenico Bando may properly assert his Fifth Amendment privilege to justify his refusal to answer six certain questions which are quoted in the course of the Court's opinion, and whether he may properly assert his Fifth Amendment privilege to justify a refusal expressed in open court that he would refuse and does refuse to comply with the Court's direction to answer those questions before the grand jury.

In 1956, Bando, together with seven co-defendants, was indicted (Criminal docket 151–65) for conspiring to violate Sections 1073 and 1503 of Title 18 U.S. Code. The indictment and trial were severed as to the co-defendants Dio, Rij, Tuso and Charles S. Carlino.

Judge Bryan's decision on the severance is reported in United States v. Dioguardi, D.C., 20 F.R.D. 10.

Upon a trial of the indictment Bando was found guilty and sentenced on December 7, 1956, to five years imprisonment. This conviction was unanimously affirmed by the Court of Appeals on May 13, 1957. 2 Cir., 244 F.2d 833.

On December 19, 1956, Bando was indicted in the Court of General Sessions, New York County, for the crime of conspiracy and maiming. On January 25, 1957, Bando pleaded guilty in the Court of General Sessions to two counts of assault in the second degree. He received on February 21, 1957, a sentence of two and a half to five years on each of the two counts, the sentences to run concurrently.

Both the prosecution in this Court and the prosecution in the Court of General Sessions grew out of the acid-blinding of one Victor Riesel.

After a number of adjournments, the case against the co-defendants Dio, Rij, Tuso and Charles S. Carlino was set down for trial on May 20, 1957. On that date, the United States Attorney requested an adjournment of the trial in order to enable the grand jury to determine whether certain Government witnesses had been tampered with or intimidated. One of the key-witnesses referred to is the respondent Bando.

Bando was called before the grand jury. His first appearance before the grand jury took place on May 21, 1957. At that time, he was asked a number of questions which he refused to answer, as appears from the transcript of the grand jury proceedings of May 21, 1957.

On May 21st, when he appeared before the grand jury, he was advised of his constitutional rights. He refused to answer six specific questions on the ground of his constitutional privilege, although the foreman of the grand jury had directed him to answer those six specific questions.

These six questions and Bando's refusal to answer them are set forth in Government's Exhibit 2 of May 23, 1957, in the present proceedings.

I read the questions and the answers:

"Q. Mr. Bando, I will remind you that you are still under oath. You have now been down before the Court and the Court has directed you to answer certain questions which were put to you in the grand jury which you formerly refused to answer. I am going to put those questions to you again at this time, those questions which the Court has already directed you to answer.

"After your arrest in August of 1956, you talked to agents of the FBI and told them of your participation in the attack on Victor Riesel and named certain other persons; is that correct? A. I stand on the Fifth Amendment.

"Q. Do you recall giving a statement to agents of the FBI after your arrest in August of 1956? A. I still stand on the Fifth Amendment.

"Q. Bando, let me read part of this statement to you, from page 3. This is the statement which you gave to the agents of the FBI in August of 1956. 'A. At about the same time Miranti and I drove uptown one night in Miranti's Buick. Miranti told me that he had an appointment to meet someone in a bar, and we went to a bar in the midtown area.'

"Q. Do you recall giving that statement, Mr. Bando? A. I refuse to answer any questions that may incriminate me.

"Q. Do you recall giving that this statement you gave in August of 1956, on page 4.

" 'Miranti then gave me $500 and told me to give the money to Carlino. I went up to Carlino's apartment that same afternoon or the following day and gave him the $500.'

"Q. Let me read you another statement, Mr. Bando? A. I stand on my Fifth Amendment.

"Q. Let me read another part of part of this statement that you gave to the FBI agents in August of '56, from page 5:

" 'I next saw Miranti about a week after the attack, and he told me to tell Carlino to stay away from him until things blew over.'

"Do you recall making that statement? A. I still stand on the Fifth Amendment.

"Q. Bando, I show you Grand Jury Exhibit No. 70, which is a photostatic copy of a statement made in August of 1956, consisting of five pages. Will you look at that and tell me if that is your signature at the bottom of each of those pages. A. I still stand on my Fifth Amendment."

As indicated, these questions were read in open court. The Court instructed

Bando to answer the said six questions. When it finally appeared that Bando desired the advice of counsel, Bando was permitted an opportunity to obtain counsel.

When he advised the Court thereafter that he was financially unable to retain a lawyer, the Court assigned counsel to him.

The proceedings were adjourned to May 23 at 11 a. m. in order to enable counsel to confer with Bando.

On May 23rd counsel for Bando argued that Bando had properly asserted his constitutional privilege in refusing to answer the six questions in issue. The United States Attorney argued in opposition, claiming that the respondent had not properly asserted his constitutional privilege under the circumstances of this case.

The proceedings were adjourned to May 24 in order to enable counsel for both sides to complete their research on the law.

The Court now considers each of the contentions of Bando's attorney.

1. The Court overrules the contention that the Court should follow the procedure prescribed in Federal Rules of Criminal Procedure, Rule 42(b). The Court is of the opinion that the procedure applicable to this summary contempt proceeding is that which is described in subdivision (a) of Federal Rules of Criminal Procedure, Rule 42.

2. The Court overrules respondent's attorney's contention that Bando was tried on a "severable indictment" which is "still open." The indictment was not severable as it was a one-count conspiracy indictment; and it is not open. Bando was found guilty of the crime charged in that indictment and he cannot be prosecuted for any phase of that conspiracy.

3. Bando's attorney further argues that his answer or answers to any or all of the six questions involved may be the link that may possibly connect him "with further crimes under that indictment." This argument is untenable as the indictment has been disposed of completely so far as Bando is concerned.

4. Bando's attorney also suggests that Bando may be prosecuted "for other means or methods used in the obstruction of justice," in that Bando may conceivably be accused of participating in the homicide of Abe Telvi.

The obstruction of justice statute, Title 18, Section 1503, contains both specific and general provisions. The specific provisions include threatening, intimidating or impeding any Federal Court witness. The general provision includes obstructing, impeding or endeavoring to influence, obstruct or impede the due administration of justice.

It is difficult to perceive any legal possibility whereby Bando's answers to these specific questions (which are the only questions before the Court) could furnish a link to an accusation against Bando for violating Section 1503.

The ultimate test is the question of the plausibility of the contention that Bando might be accused of obstructing justice within the meaning of Section 1503 by having participated in the killing of Abe Telvi and that Abe Telvi might conceivably have been a witness before a Federal grand jury or in a Federal Court proceeding; and that, therefore, one or more of Bando's answers to the six questions in issue might furnish a link in a chain of evidence that might be used against Bando in such a prosecution. This argument is fanciful; and the Court rejects it.

5. Bando's attorney also argued that one or more of Bando's answers to the pending questions may connect him with the Abe Telvi homicide and hence furnish a link in a chain of incriminating evidence that might be used against Bando in a state, as distinguished from a federal, prosecution for homicide. This contention is overruled on the authority

of the Murdock case. United States v. Murdock, 1931, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210.

6. It is next contended that Bando's answers to one or more of the pending questions might furnish a link in a chain of incriminating evidence that might be used against him in a possible prosecution based upon Title 18 United States Code, Section 1001. This section makes it a crime for a person to make a false statement "in any matter within the jurisdiction of any department or agency of the United States."

It is argued in behalf of Bando that the Government might possibly claim that Bando made false statements to the FBI agents when he was speaking to them; that the Government might undertake a prosecution of Bando for his having made one or more false statements to the FBI; and that any admission now in the form of answers by Bando to one or more of the pending questions might constitute admissions or links in a chain of incriminating evidence that might be used aganst Bando in such a possible prosecution.

There are District Court decisions indicating that Section 1001 may not apply to particular statements given to the FBI. See United States v. Stark, D.C. D.Md.1955, 131 F.Supp. 190, 207; United States v. Levin, D.C.D.Colo.1953, 133 F.Supp. 88, 90.

This Court will assume, however, for purposes of this proceeding but without adjudicating the question, that a statement given to the FBI comes within the coverage of Section 1001.

In view of all the facts and circumstances now a matter of record, it is fantastic to assume the possibiltiy of such a prosecution.

Upon the trial of Bando had before this Court, FBI Agent Kerrigan testified in detail as to the statements made to the FBI agents by Bando. This included a signed statement (Trial Exhibit 8)

This testimony by Agent Kerrigan was uncontradicted. FBI Agent Kerrigan was not even cross-examined by Bando's attorney. It is inconceivable that there could be any issue as to the fact that the statements were made by Bando to the FBI. In fact, the Government's position upon the trial of Bando was that Bando's statements to the FBI were truthful and that is why the Government introduced Bando's statement.

In view of all the evidence that was presented at the trial, there is not the slightest doubt of the truthfulness of Bando's statements to the FBI. Bando was in court represented by experienced counsel when the FBI agents testified. Neither he nor his attorney saw fit to dispute either the giving of the statement or the facts contained therein.

All of the questions now in issue in these proceedings relate to Bando's making statements to the FBI agents. For Bando now to argue that the Government would completely switch and take the contrary tack, namely, that his statements were not truthful and then to prosecute him under Section 1001 seems to this Court to be specious and reaching into the lowest range of probability.

7. It is also argued in behalf of Bando that his refusal to answer questions was justified because the answer to one or more of the questions might furnish the link in a chain of incriminating evidence involving Bando in a perjury charge under Title 18, Section 1621. This argument is that he may be asked by this grand jury whether or not the facts stated by him to the FBI were true or false and that if it should develop that he denies the truth of any of the material facts in the statement to the FBI and make such denial under oath to the grand jury and if he should be indicted for perjury in the grand jury testimony in which he testifies that his FBI statements were false, his admission that he made the prior statement to the FBI might be usable against him in a perjury prosecution.

The Court believes that this convolution of reasoning is frivolous. It is no justification for a witness to refuse to answer proper questions before a grand jury truthfully that if he truthfully testified he might expose himself to an improper charge of perjury.

The Court will not and cannot assume that he will be indicted for perjury when in fact he testified truthfully. At this point, he is simply being asked whether he made certain prior statements to the FBI. The truth or falsity of those statements is not in issue.

8. It is next argued in behalf of Bando that the grand jury may be seeking to determine not whether Bando himself was intimidated but whether Bando was part of a conspiracy to intimidate other witnesses, and that by getting Bando to answer the questions in issue the Government would be obtaining from Bando some evidence which could be used against him in showing that he was part of a conspiracy to intimidate other witnesses.

Should Bando answer the six questions in issue or any of them, it cannot be perceived how such answers to such questions would tie Bando in with a conspiracy to obstruct justice by intimidating other witnesses.

9. Finally, it is argued that although Bando's conviction in this court has been affirmed by the Court of Appeals, a petition for a writ of certiorari is now being prepared and that, therefore, until the Supreme Court has affirmed the conviction Bando has the right to assert his privilege.

 The Court rejects this argument for the reason that there is no absolute right of appeal to the United States Supreme Court. The Supreme Court may or may not grant a petition for certiorari. Thus, any appeal to the Supreme Court—and the Court will assume for present purposes that the petition has been filed—involves a double contingency: first, whether the Supreme Court would grant Bando's petition for certiorari, and secondly, what the decision of the Supreme Court might be after certiorari shall have been granted. His conviction having been affirmed by the Court of Appeals, he cannot invoke the privilege against self-incrimination with respect to any answers concerning the crime with which he was charged in the indictment and of which he was found guilty. Cf. Krogmann v. United States, 6 Cir., 1955, 225 F.2d 220, 226.

In this field of the law, the Courts are called upon to exercise a measure of judgment. None of the precedents furnishes a fixed or rigid formula for determining just when a witness may properly invoke the privilege when he asserts that his answer would furnish a link in a chain of incriminating evidence.

In United States v. Trock, 2 Cir., 1956, 232 F.2d 839, reversed 1956, 351 U.S. 976, 76 S.Ct. 1048, 100 L.Ed. 1493, the United States Supreme Court reversed the judgment of conviction for criminal contempt on the authority of Hoffman v. United States, 1951, 341 U.S. 479, 71 S. Ct. 814, 95 L.Ed. 1118.

The Court of Appeals, in an opinion written by Judge Galston, had taken the position that the witness had failed to state any reason why the answers might expose him to criminal prosecution. Judge Galston had reached the conclusion that the questions were free from criminal implication and were not part of a setting connoting criminal implication. Applying the test of the Hoffman case, Judge Galston concluded that there was no showing that the questions asked would link the witness with any criminal activity.

In view of the fact that the United States Supreme Court reversed the Court of Appeals, it is clearly appropriate to consider closely Judge Medina's dissenting opinion in the Trock case. Judge Medina said (232 F.2d at page 845):

"Thus it is to the surrounding circumstances and not to explanations by the witness that the Court must look to see whether the refusal

to answer has some reasonable and credible basis. If such a scrutiny makes it highly probable that the refusal is due to mere whimsy, or scrupulosity, or reluctance to participate in the disclosure of criminality on the part of others, then the witness must answer the questions or take the consequences, even if his friends or relatives are the ones against whom prosecution seems imminent or possible."

And then Judge Medina asked the question:

"What is the background here?"

After reviewing the background, Judge Medina concluded that other circumstances, viewed in their relation to one another, constituted a pattern of suspicion as to more than amply justify appellant's expressed belief that answers to any of the questions might provide a lead to further disclosure, the inevitable or probable effect of which would have been appellant's indictment.

Applying the criteria defined by Judge Medina to the facts in the present case, the inescapable conclusion is that there is no reasonable and credible basis in the surrounding circumstances to indicate that Bando was justified in his expressed belief that answers to any of the questions in issue might provide leads to further disclosure, the effect of which might possibly result in Bando's indictment. Indeed, a scrutiny of the background of all the pertinent facts and surrounding circumstances makes it highly probable that Bando's refusal is (to quote Judge Medina) "due to mere whimsy, or scrupulosity, or reluctance to participate in the disclosure of criminality on the part of others."

In the Hoffman case, supra, a majority of the Supreme Court, speaking through Mr. Justice Clark, said (341 U. S. at pages 486 to 487, 71 S.Ct. at page 818):

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. * * * But this protection must be confined to instances where the witness has reasonable cause to aprehend danger from a direct answer. * * * The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, * * * and to require him to answer if 'it clearly appears to the court that he is mistaken.' * * * The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' "

If a grand jury witness is "clearly entitled to assert the privilege, his motives for doing so are immaterial." United States v. Courtney, 2 Cir., 1956, 236 F.2d 921, 923. But, as stated by Circuit Judge Lumbard, dissenting in the Courtney case (236 F.2d at pages 925, 926):

"Such a claim of the privilege should induce us to question its good faith, not because a bad motive can make a clearly valid claim invalid, but because such a motive casts doubt on the incriminatory nature of the question.

* * * * * *

"On this record, even the loose test set forth in United States v. Coffey, 3 Cir., 1952, 198 F.2d 438, 440 is not complied with for even if we can imagine that it could be 'shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States' certainly this 'suggested course and scheme of linkage' does

'seem incredible in the circumstances of the particular case.'

"In weighing the validity of a claim of the Fifth Amendment's protection, we ought to be guided by realities and those things which may reasonably happen, and not by the purely theoretical and fantastical."

If we apply the standard defined in the Hoffman case to the facts in this case, the Court must conclude that it is not evident from the implications of the questions in the setting in which they are asked that a responsive answer to the question or to any of them or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. And the Court is mindful of Mr. Justice Clark's further statement that the trial judge "must be governed as much by his personal perception of the peculiarities of the case" —words which I emphasize—"as by the facts actually in evidence."

This Court sat as the trial judge in the trial of Bando, Leo Telvi, Carlino and Miranti and has close familiarity with all of the evidence. Under the circumstances of the present case, the contention that Bando fears prosecution, for example, for having given a false statement to the FBI is ludicrous.

The Government charged in the indictment that Bando participated in the conspiracy; and at the trial of Miranti, Bando and Telvi there was a wealth of evidence that Bando's statement was in fact true.

The Government called as a witness Joseph Peter Carlino, who had pleaded guilty to the indictment, and who testified as to Bando's participation. To suggest on such a record that the Government is apt to prosecute Bando for his having made a false statement in admitting that he participated in the conspiracy is to indulge in a flight of pure fancy.

Bando himself has never claimed that the statement was false. Although he did contend that he had not given the statement voluntarily, the Court of Appeals rejected that contention.

At the time that his motion to suppress was first made in the District Court, Bando's counsel made it clear that he was saying only that the statements were improperly obtained and not that they were false (Trial Record, page 144).

Bando's plea of guilty in the Court of General Sessions confirms the truthfulness of his statements to the FBI, and for that additional reason his plea of guilty in the State Court has significance.

Bando joined with Miranti in a brief in the Court of Appeals, which stated (I quote from page 7 of Bando's brief):

"This case does not involve the question of the guilt or innocence of these appellants for any part they may have played in the dastardly acid attack on Victor Riesel. As to that crime these appellants [including Bando] have both pleaded guilty for their participation therein in the Court of General Sessions of the County of New York, State of New York, and have been given long jail sentences in prison."

In the light of all these facts, there is no basis whatsoever for Bando's fear that truthful answers concerning his statement to the FBI will tend to incriminate him.

The contention that Bando's refusal to answer is based on the danger that answers may tend to incriminate him in the substantive offense of obstructing justice or fleeing to avoid prosecution are also without substance. As already stated, Bando received the maximum sentence of five years for his participation in the conspiracy to violate two sections of the United States Code. Having been placed in jeopardy on the whole indictment, he may not now be tried again, as already indicated, for that phase of the conspiracy relating to obstruction of justice.

The Court of Appeals in this circuit has repeatedly expressed its disapproval of consecutive sentences upon conspiracy

and substantive counts arising out of the same set of facts. In addition to the five years which Bando has received in this court, he has, as already stated, been sentenced to an additional term of two and a half to five years in the State Court. By reason of the nature of the facts, the Government was forced to sever and to have two trials of the indictment instead of one. But there has never been the slightest indication that the Government would follow the foolish procedure of successive indictments and trials of the same defendants first for conspiracy and then for substantive violations. Such procedure would not only result in needless waste of the time of the Court, counsel and witnesses and the multiplicity of trials, but would fly in the face of the disapproval of consecutive sentences voiced by the Court of Appeals in/ this circuit. This means, as a practical matter, that Bando could not be sentenced to any more time, for if the Court of Appeals could find the slightest error in the record it would reverse. See, for example, United States v. Chiarella, 2 Cir., 1950, 184 F.2d 903.

Furthermore, the only phase of the conspiracy on which the Government tried Bando was that phase concerning Telvi's flight to avoid prosecution. Bando could not be tried for a substantive offense except as an aider and abettor, since Section 1073 prohibits flight only by the fugitive himself. Therefore, it would only be by aiding and abetting the flight of another person that Bando could be guilty of the substantive offense. Under those circumstances, it might well be argued that the substantive offense merged with the conspiracy and that having been once in jeopardy on the conspiracy, Bando could not be tried again. See United States v. Katz, 1926, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986.

The astute suggestions of Bando's counsel might well have had greater force were it not for the fact that the Court has had the benefit of close familiarity with the record. On the basis of the clearly established facts, it is patent that the claim to the privilege is based upon an imaginary possibility of danger, having no relation to reality. In the interpretation of constitutional rights and privileges, the Courts do not indulge in ergoism.

Bando's reluctance to testify does not rest upon any fear that he will further incriminate himself but rather upon his fear of incriminating others. After the death of Abe Telvi, Miranti, Bando and Joseph Peter Carlino were all "very scared" (Trial Exhibit 9). They did not know who did it and they were afraid that they might be next (Trial Exhibit 9). Bando told the FBI agents, who questioned him after his arrest, that if he talked "his life would not be worth three cents" (Trial Testimony of Agent Kerrigan, page 1474). Bando repeatedly expressed fears for the safety of his family (Trial Testimony of Agent Kerrigan, page 1473).

This Court has liberally interpreted the Fifth Amendment privilege. See United States v. Courtney, 2 Cir., 1956, 236 F.2d 921, 923.

The Fifth Amendment stands as one of our great constitutional safeguards. The Courts have made clear their intention to see that it is made available to those who seek to avoid incriminating themselves and deny it to those who seek to use it to avoid incriminating others.

The mere fact that a witness may have counsel imaginative enough to conceive of some remote and unsubstantial danger of incrimination is not enough to justify a claim of the privilege. If that were the situation, the law would never be able to compel any witness to answer any questions.

In Brown v. Walker, 1896, 161 U.S. 591, at page 600, 16 S.Ct. 644, at page 648, 40 L.Ed. 819, the Supreme Court said:

"'We think that a merely remote naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected

by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios*, protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.'

\*　　\*　　\*　　\*　　\*

"The danger of extending the principle \* \* \* is that the privilege may be put forward for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person, who is interested in concealing the facts to which he would testify. Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding his own good name, to be made the tool of others, who are desirous of seeking shelter behind his privilege."

It is obvious that the refusal of Bando was based upon fear of harm to himself or his family if he incriminates others. Justice need not be blind to that fact.

The Court of Appeals in this circuit in the case of Loubriel v. United States, 2 Cir., 1926, 9 F.2d 807, at page 808, stated:

"The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove themselves incapable of dealing with actualities if it were so, for there is no surer sign of a feeble and fumbling law than timidity in penetrating the form to the substance. We have not the least doubt of the power of the District Court to punish a witness for an evasion patently put forward to avoid his duty. No doubt, since its exercise is drastic, it is to be used with caution, but at times no other means exists to prevent an entire miscarrage of justice."

Judge Medina, approving the procedure which has been followed substantially in the present case, said in United States v. Curcio, 2 Cir., 1956, 234 F.2d 470, 475:

"The test is whether or not on the record before the Court defendant has made a showing 'that he was likely to be endangered by answering [the questions].' \* \* \* We can find no such showing here. \* \* \* Here there is, at most, atmosphere, which will not suffice."

The Court's conclusion, therefore, is that this is not a case of constitutional silence. It is a case of underworld lockjaw.

The witness will be directed to answer the questions.