Sandra (Claretta) HASHAGEN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16917.

United States Court of Appeals Ninth Circuit.

Aug. 27, 1960.

Belli, Ashe & Geary, San Francisco, Cal., Wirin, Rissman, Okrand & Posner,

Los Angeles, Cal., Jack A. Dahlstrum, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Robert J. Jensen, Thomas R. Sheridan, Asst., U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS, HAMLEY and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is an appeal by Sandra (Claretta) Hashagen from an order of the district court committing her to the custody of the United States Marshal until she purges herself of contempt of court growing out of her refusal to answer several questions put to her by a grand jury on May 12, 1960. Appellant was subpoenaed to appear as a witness before that body and did so on four occasions: May 2nd, 5th, 9th, and 12th.[1] As a result of her persistent and continuous refusal to answer questions propounded to her, she was taken before the district judge on May 12th by the United States Attorney where the latter, after placing in evidence the transcript of the day's proceedings before the grand jury, moved that appropriate action be taken against the witness.

The district judge examined the transcript in detail and heard arguments on each question by counsel for both the government and the witness. He was apprised that the purpose of the grand jury's investigation was to inquire into the financial transactions and business affairs of one Cohen, and that some individual had already been indicted as a result of this investigation.

The transcript itself revealed that on the evening of December 2, 1959, the witness had gone alone to a night club called "Rondelli's" near Los Angeles to meet Cohen; she was informed on her arrival that Cohen was in the manager's office at the rear of the club, so she waited for him in the main room where he presently joined her. Shortly afterward, a shooting occurred at an adjoining table where a character variously known as Jack Whalen, "J. O.," and "The Enforcer" was mortally wounded; thereupon the witness hurriedly prepared to leave in Cohen's Cadillac, the keys to which he had previously given her, and as she was doing so, the "maitre d'" of the club handed her a money order in the sum of $800.00, payable to Cohen, together with several items of jewelry. A short time later she was arrested by the Los Angeles police who, during a search of her apartment incidental to the arrest, discovered the jewelry; it was subsequently turned over to them. The transcript further showed that many of the questions which the witness had refused to answer inquired into the ownership of, and her interest in, the jewelry, the nature of her association and dealings with Cohen, and the identity of the "maitre d'" at Rondelli's.

During the discussion of these questions between court and counsel, the attorney for the witness asserted that the government claimed that the jewelry was Cohen's property "[a]nd they want to make some kind of levy on it in order to collect moneys that are assertedly due from Mr. Cohen." He suggested that if the witness were made to answer the questions and reveal the nature of her interest in the jewelry, she might be subject to prosecution under 26 U.S.C.A. § 7206(4), which makes a federal crime of " * * * removing, depositing, or concealing * * * any property upon which levy is authorized * * * with intent to evade or defeat the assessment or collection of any tax imposed by this title."

The district judge rejected this proposition and observed generally that the

---

1. This grand jury was empanelled in January, 1960, and is presently in session; unless sooner discharged by the court it will continue in existence until August, 1961. See Rule 6(g), Fed.R.Crim.P., 18 U.S.C.A. At the oral argument, counsel for the government advised this court that appellant will be afforded an opportunity at any time she desires to comply with the order of the court. The commitment, of course, cannot extend beyond the grand jury adjournment. Yates v. United States, 9 Cir., 1955, 227 F.2d 844.

questions, except for a few which were later withdrawn, did not require answers which might tend to incriminate. The witness thereupon expressed a willingness to "try to answer the question," but upon her return to the grand jury room she again refused to answer and within thirty minutes was back before the court. Upon hearing the transcript read, the court ordered the witness to return again to the grand jury room and answer the following questions:

"Was the jewelry that was given to you on December 2nd, 1959, in the general area of Rondelli's restaurant out in the San Fernando Valley, given to you by the same Phillip Packer that was in the anteroom of the grand jury, and was also present in the anteroom of the grand jury today?

\* \* \* \* \* \*

"Miss Hashagen, do you own the jewelry that Mr. Phillip Packer handed to you in Rondelli's restaurant on the night of December 2nd, 1959?

\* \* \* \* \* \*

"Do you have an ownership interest in the jewelry that was given to you or handed to you at Rondelli's restaurant on the night of December 2nd, 1959?

\* \* \* \* \* \*

"On the jewelry in question, that is the jewelry that was handed to you at Rondelli's restaurant on December 2nd, 1959, did you see that jewelry at any time, or any piece of it, prior to December 2nd, 1959?

\* \* \* \* \* \*

"Has \* \* \* Cohen ever given you a gift?

\* \* \* \* \* \*

"Has \* \* \* Cohen ever given you any cash?

\* \* \* \* \* \*

"Has \* \* \* Cohen ever secured any type of employment for you?"

2. The characterization is that of Mr. Justice Clark in Hoffman v. United States,

The witness refused to comply with the order, stating, "I am standing on the Fifth;" the court then committed her " \* \* \* until such time as she sees fit to answer such questions as she was ordered to answer and then she will be immediately released."

The "guarantee against testimonial compulsion" [2] embodied in the Fifth Amendment to the United States Constitution must be liberally construed and broadly applied in order to sustain fully the basic right it was designed to protect. It is not merely an admission of guilt of a federal crime, or of a probative fact which, with others, may aid in establishing guilt, that may be withheld; the privilege to remain silent may also be validly asserted where the answer to a question would be likely to provide a lead or clue to a source of evidence of such crime, and thus furnish a means of securing one or some of the "links in the chain of evidence" required for federal prosecution of the witness. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; Alexander v. United States, 9 Cir., 1950, 181 F.2d 480. The emulous conflict between the government's right to information, including the consequent duty of the citizen to testify, and the witness' right not to incriminate himself, must be balanced in favor of the constitutional privilege. If at times this results in closing and locking the doors of discovery to the government, that is but a calculated and foreseen consequence of recognizing this basic right in a free society.

The scope of the privilege is clearly outlined by innumerable decisions, but the bare assertion by a witness that he may incriminate himself does not establish that fact: " \* \* \* his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified \* \* \* ". Hoffman v. U. S., 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118. If a witness were required actually to prove

1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118.

the validity of his claim of privilege, he would necessarily relinquish it; in recognition of this potential loss, the Supreme Court has declared:

"To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" Hoffman v. United States, supra, 341 U.S. at page 486, 71 S.Ct. at page 818.

■ In light of these principles, we believe answers to the above seven questions, in the setting in which they were asked, could require a disclosure of elements and probative facts of federal crimes, or clues leading to them, which might reasonably fall within the privileged "dangers" referred to in Hoffman.

■ It is apparent that the district judge adopted the government's contention that the answers to the questions propounded would at best prove helpful only in some prosecution against Cohen. If this were true, the witness was properly required to answer, for the Supreme Court settled this question long ago:

"The right of a person under the 5th Amendment to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person." Hale v. Henkel, 1906, 201 U.S. 43, 69, 26 S.Ct. 370, 377, 50 L.Ed. 652.

But it seems to us that if the answers might tend to increase the danger toward Cohen, they could well and on the same basis similarly affect the witness herself. So viewed, the answers could be properly withheld. See United States v. Courtney, 2 Cir., 1956, 236 F.2d 921. In this regard, the statute called to the attention of the court by counsel for the witness merits more than passing consideration: one who aids in its violation may be an accomplice.

When the tableau sketched by this record is examined, the incriminating dangers to this witness become apparent. She was present at the fatal shooting of the man significantly called "The Enforcer," in a night club that was apparently frequented by underworld figures of greater and lesser notoriety. With the presence of the police momentarily expected, she was suddenly handed valuable property for the fairly obvious purpose of secreting it from the police. The fact is that she quickly left the night club in Cohen's Cadillac before the police arrived, and it was only after her arrest wherein the jewelry was discovered that she finally turned it over to the authorities; apparently the money order, with Cohen's name on it, was never found.

Then came the investigation of Cohen and his financial transactions for the manifest purpose of uncovering possible income tax violations, and this inquiry had already been the source of one indictment against a person other than Cohen himself. The government immediately displayed a keen interest in the witness' connection with the jewelry and the criminally-charged events occurring at Rondelli's on December 2nd. In such posture, the questions concerning the jewelry were filled with criminating implications which the district judge should have recognized. It may be fairly inferred, therefore, from what was before the court that answers to the questions regarding the jewelry might well disclose the proscribed concealment found in the above statute or furnish evidence which could be used in a prosecution under that section.

In addition to the questions regarding the jewelry, however, the witness was also asked whether she had at any time received any cash or gifts from Cohen.

These questions, being general in character and perhaps unlike those relating

to the jewelry, were not directly coupled to a particular transaction or incident which would lend them criminal color. To that extent, it might plausibly be suggested that, if any incriminating dangers lurked in answers to them, the only person that appeared to be affected was Cohen; as indicated earlier, the lower court adopted this view.

It has been said that where a question is innocuous on its face, a bare assertion of the privilege is not enough: the witness must come forward to shed some positive light tending to show its incriminating aspects. United States v. Weisman, 2 Cir., 1940, 111 F.2d 260; but cf., United States v. Coffey, 3 Cir., 1952, 198 F.2d 438. However, the standard pronounced in Hoffman v. United States, supra, commands the trial judge to employ a large measure of his own intuition and basic legal instincts in determining whether a particular question is innocuous and thus unprotected absent some positive disclosure by the witness of its hidden dangers; it requires a searching consideration of the "implications of the question, in the setting in which it is asked," before any question can be held to be truly innocuous.

█ This obviously enables and requires the trial judge to view a claim of the privilege in a different perspective than he would an ordinary disputed fact in a normal adversary proceeding; he should not confine his attention to and rest his conclusion simply upon the facts before him, but must draw heavily upon his own experience in weighing the plea and deciding the issue. In short, he may and must "be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." Hoffman v. United States, supra, 341 U.S. at page 487, 71 S.Ct. at page 818.

So viewed, we believe the questions regarding the cash and gifts cannot be altogether divorced from the background of events occurring at Rondelli's on December 2nd; they are colored with the same criminal implications and thus readily suggestive of a substantial risk to the witness. No significant distinction appears between these two groups of questions: if there is a danger of prosecution for concealing the jewelry, the same danger could well exist as to cash and gifts.

In addition, the district judge could and should have considered the answers protected because they might expose the witness to a hazard under yet another statute. Thus, § 371 of Title 18, U.S. C.A., makes criminal a conspiracy " * * either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose * * *." Violations of this well known statute take many forms.[3] But common to all of them is the requirement not only of an agreement between two or more persons to commit an offense against or to defraud the United States, but that such persons " * * * do any act to effect the object of the conspiracy * * *." The questions put to this witness, seeking as they did information as to whether she had ever received any gifts or cash from Cohen, might well require answers helpful to the government in a conspiracy prosecution. Ballmann v. Fagin, 1905, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433.

The remaining question asked of the witness is whether Cohen ever secured employment for her. An affirmative answer would of course disclose the fact of her employment as well as some business or other association with Cohen. Once again, the incidents surrounding the evening of December 2nd at Rondelli's suggest that Cohen and his asso-

---

3. The frequency of conspiracy counts in indictments caused Judge Learned Hand to label it, " * * * that darling of the modern prosecutor's nursery." Harrison v. United States, 2 Cir., 1925, 7 F. 2d 259, 263. For other examples of in-

dictments charging conspiracy to evade payment of taxes, see Kobey v. United States, 9 Cir., 1953, 208 F.2d 583; United States v. Klein, 2 Cir., 1957, 247 F.2d 908; United States v. Gordon, 3 Cir., 1957, 242 F.2d 122.

ciates were something short of model citizens. The subsequent investigation of Cohen by the grand jury does nothing to detract from this, but in fact bolsters the implication that he was and is involved in questionable activities.

It is not improbable that the witness' association with Cohen and others involved her in the commission of federal crimes. By disclosing the fact of her employment through Cohen, she not only might establish an imminent connection with his activities, but reveal as well her own sources of income, which could be used in a federal prosecution against her for income tax evasion. Because of these implications, we think the admonition of the Supreme Court in Hoffman appropriate here:

> "[t]he court should have considered, in connection with the business questions, that the chief occupation of some persons involves evasion of federal criminal laws, and that truthful answers by petitioner to these questions might have disclosed that he was engaged in such proscribed activity." [341 U.S. at page 487, 71 S.Ct. at page 819].

We are therefore convinced, as the Supreme Court was in Hoffman, that " * * it was not 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answers cannot possibly have such tendency' to incriminate." [4] 341 U.S. at page 488, 71 S.Ct. at page 819.

The government contends, however, that even if the answers to these questions might be criminating, the witness may not now rely upon the privilege to justify her silence; the argument is made that the witness relinquished her right because she had freely answered questions dealing with related matters at one of her earlier appearances before the same grand jury.

The privilege is one that may be waived, and the fact of waiver may be constructively surmised. United States ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Brown v. Walker, 1896, 161 U.S. 591, 16 S.Ct. 644, 40 L. Ed. 819; McCarthy v. Arndstein, 1923, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023. Although the Supreme Court has long recognized that a witness may waive his privilege, it cautioned in McCarthy v. Arndstein, supra, that if " * * * the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." 262 U.S. at page 359, 43 S.Ct. at page 563.

A recent concrete application of this statement is found in Rogers v. United States, 1950, 340 U.S. 367, 368, 71 S.Ct. 438, 95 L.Ed. 344. The witness in that case had testified before a federal grand jury that she was a member of the Communist Party and had held the office of treasurer, but she refused to divulge the name and identity of her successor to whom she had turned over the party records. The court held that this testimony constituted a waiver because it was incriminatory, not only as to a violation of the Smith Act (18 U.S.C.A. § 2385), but as to a conspiracy to violate that Act as well.

In its rationale the court relied on Brown v. Walker, supra, for the principle that " * * * if the witness himself elects to waive his privilege * * * and disclose his criminal connections, he is not permitted to stop, but must go on and make a full disclosure." 161 U.S. at page 597, 16 S.Ct. at page 647. Relying on McCarthy v. Arndstein, supra, the court then further refined this principle as to specific facts, saying, " * * * where criminating facts have been volun-

---

4. See Simpson et al. v. United States, 1957, 355 U.S. 7, 78 S.Ct. 14, 2 L.Ed.2d 22, reversing per curiam Simpson v. United States, 9 Cir., 1957, 241 F.2d 222; Wollam v. United States, 9 Cir., 1957, 244 F.2d 212, and MacKenzie v. United States, 9 Cir., 1957, 244 F.2d 712; see, also, Shane v. United States, and (Hitson, McGowan and Hammett v. United States), 9 Cir., 283 F.2d 355.

tarily revealed, the privilege cannot be invoked to avoid disclosure of the details." [5] 340 U.S. at page 373, 71 S.Ct. at page 442.

It does not appear from the Rogers case that an "incriminating fact" is the equivalent of a complete admission of guilt or that waiver may only be inferred from a disclosure of elements constituting the whole crime, for in Rogers the witness had testified only that she was a member of and active in the Communist Party; her admissions were insufficient by themselves to constitute a violation of the Smith Act.[6] Rogers does hold that the doctrine of constructive waiver will come into operation whenever a single incriminatory fact has been admitted, though all of the necessary elements or even the evidentiary facts required for conviction have not been so admitted.[7]

Yet where there has been such a partial disclosure, it is difficult to determine just how much has been waived. To be sure, the witness must disclose the waived "details" of the criminating fact, but where is the line drawn between a mere detail of the admitted criminating fact and a further criminating, yet still protected fact? For example: if three facts are logically related, and each furnishes some proof or constitutes one of the several elements of a crime not yet admitted, does an admission of the first set off a chain reaction requiring a disclosure of the second which in turn waives the third?

The answer, we think, is found in this statement from the Rogers case:

"  *   *   *  The court was required to determine, as it must whenever the privilege is claimed, whether the question presented a reasonable danger of further crimination in light of all the circumstances, including any previous disclosures. As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination."

The touchstone in Rogers, is the adjective "further," and thus an admission of a criminating fact may waive the privilege as to the details of that fact so long as they do not *further* incriminate, but where those details would so incriminate, the privilege is not waived. See McCarthy v. Arndstein, 1923, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023; Bart v. United States, supra, note 6; Singer v. United States, supra, note 6.

In the present case, the particular testimony relied upon by the government under its claim of waiver was given before the grand jury on May 5th. At that time the witness had denied ever receiving any jewelry or gifts from Cohen, and though refusing to state whether she was acquainted with Packer, the "maitre d'" at Rondelli's, she did acknowledge a conversation with the Los Angeles police after her arrest wherein she explained

---

5. It is arguable, because of the Supreme Court's reliance on McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, and Foster v. People, 1869, 18 Mich. 266, that the term "incriminating fact" requires a clear showing of proof of crime, or all of the essential elements required for conviction of such crime. While the language in those cases lends support to this argument, the factual situation in Rogers belies such an interpretation because the witness had not admitted all of the elements required for prosecution under the Smith Act, thus indicating a more limited view of what the court meant by "incriminating fact."

6. In addition to active membership in the Communist Party, knowledge of the unlawful purpose of the proscribed organization is required. 18 U.S.C.A. § 2385; Bart v. United States, 1953, 91 U.S.App. D.C. 370, 203 F.2d 45, reversed on other grounds in 1955, 349 U.S. 219, 75 S.Ct. 712, 99 L.Ed. 1016; Singer v. United States, 1957, 100 U.S.App.D.C. 260, 244 F.2d 349, reversed on other grounds in 1957, 101 U.S.App.D.C. 129, 247 F.2d 535.

7. Compare, United States v. Courtney, 2 Cir., 1951, 236 F.2d 921; United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837, 147 A.L.R. 240 (dissenting opinion); see, also, 48 Cal.L.R. 123 (1960).

her dealings with Packer, including the statement that she had received the jewelry from him and had later turned it over to the police. But in addition to this, she also testified directly and at length that she had in fact received the jewelry and money order from Packer at Rondelli's on December 2nd.

In determining whether this testimony constitutes a waiver, we think it appropriate to recognize the plight of a subpoenaed witness appearing without counsel behind the closed doors of a grand jury proceeding. As stated by Mr. Justice Black, " * * * On the one hand, they risk imprisonment for contempt by asserting the privilege prematurely; on the other, they might lose the privilege if they answer a single question." Rogers v. United States, 340 U.S. 367, 368, 378, 71 S.Ct. 438, 95 L.Ed. 344 (dissenting opinion); see, also, Aiuppa v. United States, 6 Cir., 1952, 201 F.2d 287.

Obviously the danger is not that the witness will gain an advantage over his adversary by clouding the truth through use of the privilege, but that he might exercise the privilege to obstruct the function of the grand jury under the guise of self-incrimination. See Judge Frank's exhaustive dissenting opinion in United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837, 840; Note, 70 Harv.L.R. 1454 (1957). Yet if the privilege is to have force, the witness must necessarily obstruct that function whenever he is in danger of criminating himself. When this right is coupled with the admonition that "[w]aiver of consti-

tutional rights * * * is not lightly to be inferred," a necessary corollary is that the doctrine of waiver should be confined in its operation to narrow limits and charily applied else the constitutional guarantee would be effectively nullified by a mere expedient.[8] Smith v. United States, 1949, 337 U.S. 137, 150, 69 S.Ct. 1000, 93 L.Ed. 1264; Emspak v. United States, 1955, 349 U.S. 190, 198, 75 S.Ct. 687, 99 L.Ed. 997.

Turning to appellant's admissions in the present case, the first inquiry is whether the bare admission of her receipt of the jewelry from Packer amounts to an "admission of guilt" or disclosure of an "incriminating fact," for if they do not, the seven questions propounded to appellant, being criminatory, justifiably remained unanswered. Her testimony does not disclose a federal crime or any facts showing the character of her possession; nor does it indicate any positive connection between the jewelry and Cohen.

However, we think that by admitting possession appellant has disclosed a "criminating fact." While short of establishing guilt, her possession, viewed in the context of the elements required to establish a crime under 26 U.S.C.A. § 7206(4) or 18 U.S.C.A. § 371, was a "link in the chain of evidence." Without such possession or other contact with the jewelry it would be difficult to show concealment or removal; with that possession, an essential step in proving either of the above crimes is established.[9]

8. It is conceded that "appearing before a grand jury is not an unduly coercive situation" and does not by itself affect the voluntary nature of such testimony, United States v. Cleary, 2 Cir., 1959, 265 F. 2d 459. From this it would follow that testimony given by a witness during his examination should not be presumed to be involuntary. Nevertheless, where the question of waiver is involved, the dilemma of the witness should be given some consideration, for at times only the most articulate and perceptive legal mind could discern whether the answer to a given question would fling open the door of full disclosure.

9. This is not to say that every time a question is answered to which the privilege would attach, a waiver is thereby effected, for the privilege, as now liberally construed, includes many apparently innocuous questions which do not contain "criminating" facts, yet which could provide information leading to such facts and for that reason are protected. If the privilege and waiver are coextensive, there would be little left of the privilege and the witness' peril increased to such an extent that he would, and could, stand mute most of the time. By necessary implication, therefore, the "incriminating

But allowing that this admission is a criminating fact, a second problem faces us: whether the particular questions asked this witness "presented a reasonable danger of further crimination in light of all the circumstances," or whether the incriminatory fact already admitted encompassed the probable answers to the seven questions so that those answers could not reasonably result in further danger to the witness.

■ No testimony given by the witness would in any way justify an application of the doctrine of waiver as to the three questions regarding transactions between the witness and Cohen. Possession of the jewelry bears no logical or mediate relationship to the question of whether Cohen had ever given her a gift, cash or secured employment for her. None of these inquiries are suggestive of "details" of the admitted fact of possession of the jewelry.[10]

The four remaining questions present a closer question; all concern the particular jewelry that the witness had admitted she possessed and to that extent they might all be said to be details of a matter already testified to. Two of these seek information regarding the nature of the witness' interest in the jewelry. Answers disclaiming any such interest would necessarily carry with them the implication that she was holding the jewelry for someone else, thus adding a useful fact in a criminal prosecution for violation of 26 U.S.C.A. § 7206(4). The answers might readily advance the witness another step down the path of federal prosecution.

Another of these questions asks whether the witness had ever seen the jewelry before December 2nd. However, it cannot be said to seek a "detail" of a fact already disclosed; it concerns an unrelated fact occurring before the date she admittedly received possession of the jewelry, and the only relationship between this question and the matter previously disclosed is that both concern the jewelry. To require an answer would expose the witness to further incrimination involving a distinct transaction from that already admitted.

■ The last of the four questions is whether the Phillip Packer sitting in the anteroom of the grand jury was the same "Phil Packer" from whom she had admittedly received the jewelry at Rondelli's on December 2nd. As we have already held, the question called for an answer which might incriminate the witness, but she, as the record shows, had in her prior testimony revealed the same fact that this question sought to elicit. This particular question was repetitious but nevertheless the witness should have answered it; her refusal constitutes a direct contempt of court.

However, the imprisonment imposed upon her by the district court was not punitive, but remedial; it was calculated to coerce answers to all seven questions. Appellant could and did rightly refuse to answer all questions save this one, and that she had already answered. To affirm the order of commitment would simply require the witness to reiterate an answer already given; since this would serve no useful purpose, the order must be reversed.[11]

facts" which effect a waiver are not identical with the criminatory implications of a question to which the privilege attaches in the first instance.

10. Appellant did make negative responses to substantially the same three questions at one of her earlier appearances in the proceedings, but a negative reply to these questions did not incriminate and could not, therefore constitute a waiver. Powell v. United States, 1959, 96 U.S.App.D.

C. 367, 226 F.2d 269; Ballantyne v. United States, 5 Cir., 1956, 237 F.2d 657; Emspak v. United States, 1955, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997.

11. Appellant also urges on this appeal that the order of commitment was a nullity because it was coercive and therefore civil in nature, whereas the contempt, if any was committed, was wholly criminal. In view of our conclusion, this contention need not and will not be considered.